[No. 39703.    Department One.    April 25, 1968.]

THE STATE OF WASHINGTON, *Respondent, v.* JAMES WILLARD BROOKS, *Appellant.*\*

R. M. Holt (of *Cushman & Holt*), for appellant.

*Charles O. Carroll* and *Larry L. Barokas*, for respondent.

HALE, J.—Driving conditions were bad that early evening of January 2, 1967, when Norman May and his wife were killed in an automobile accident. It was windy and dark, and raining very heavily. Shortly before 7 o'clock, the Mays, driving south in their Chevrolet, were rounding a curve to the left on the Pine Lake Road when their car was struck head on by the defendant's Ford car. The Mays were killed instantly, but the defendant, James Willard Brooks, survived to describe the accident in court.

\*Reported in 440 P.2d 199.

By information, the Prosecuting Attorney for King County charged the defendant in two counts with the crime of negligent homicide, alleging in each count that the defendant "did operate said motor vehicle in a reckless manner, and with a disregard for the safety of others, and while under the influence of or affected by the use of intoxicating liquor." The first count involved the death of Norman C. May and the second that of Robina A. May. From a judgment and sentence entered upon a verdict of guilty as to each count, imposing concurrent terms of not more than 20 years' imprisonment, the defendant appeals, urging four assignments of error.

In instructions Nos. 2 and 3, the court charged as to each count respectively that the state was required to prove beyond a reasonable doubt "That the defendant operated said motor vehicle either:  (a) In a reckless manner, OR (b) With disregard for the safety of others, OR (c) While under the influence of or affected by the use of intoxicating liquor . . . ."

Defendant, claiming insufficient evidence to support the issue, urges error in submitting to the jury whether he was under the influence of or affected by intoxicating liquor. This assignment of error arises in a curious frame of reference, for the jury, in answering three interrogatories put to it in instruction No. 13,[1] found expressly in interro-

---

[1]"You are instructed to answer the following interrogatories and in addition thereto fill in the final forms of verdict appropriate to your finding.

"INTERROGATORY No. 1

"Did the defendant, James Willard Brooks, operate a motor vehicle at the time and place herein charged in a reckless manner as in these instructions defined?

"ANSWER: *No*

"INTERROGATORY No. 2

"Did the defendant, James Willard Brooks, operate a motor vehicle at the time and place herein charged with disregard for the safety of others as in these instructions defined?

"ANSWER: *Yes*

"INTERROGATORY No. 3

"Did the defendant, James Willard Brooks, operate a motor vehicle

gatory No. 3 that the defendant was not under the influence of or affected by intoxicating liquor. Also, answering interrogatory No. 1, in the same instruction, the jury found defendant had not operated his vehicle in a reckless manner, but in interrogatory No. 2 answered that he had done so "with disregard for the safety of others."

Despite the finding that he was not under the influence of or affected by intoxicating liquor, defendant contends that presenting that very issue to the jury constituted error which inevitably prejudiced the jury.

■ That a court should not submit to the jury an issue of fact unless there is substantial evidence in the record to support it is a well-established rule. *State v. Collins,* 66 Wn.2d 71, 400 P.2d 793 (1965); *State v. Nelson,* 144 Wash. 370, 258 Pac. 24 (1927). But in this record we find substantial evidence and inferences to be drawn therefrom which, if believed and drawn by the jury, could have supported a finding that defendant was under the influence of or affected by intoxicating liquor.

Testimony concerning defendant's drinking that afternoon came from witnesses presumably friendly to him— persons who had been with him socially or serving him at the Eagles Club in Issaquah. Nevertheless, the testimony of these witnesses established the defendant's consumption of beer during several hours right before the accident. One witness, a waitress at the Log Cabin Tavern, testified that defendant and his wife came to the tavern at about 11:30 a.m., January 2nd, and she served him one bottle of beer, but that he drank only a part of it. Another witness, a waitress at the Eagles Club in Issaquah, testified that, between 12:30 and 4 p.m., she served the defendant six or seven bottles of beer. Another waitress, who came on duty at 4 p.m. at the Eagles Club that day, said she served the defendant a bottle of beer around 4:20 or 4:30 and that to her knowledge he drank at least one-half of this. A barten-

at the time and place herein charged while under the influence of or affected by the use of intoxicating liquor as herein above defined?

"ANSWER: *No"* Instruction No. 13.

der at the Eagles accounted for another bottle of beer which he served to the defendant sometime during the afternoon. None of the witnesses said that defendant appeared intoxicated when he left the Eagles Club around 5:30 p.m. Other evidence, however, tended to establish that defendant was under the influence of intoxicants from his manner of driving and his conduct at the accident.

Two witnesses testified that they were driving north on Pine Lake Road at 45 miles per hour when defendant's car overtook them about 1 mile from the scene of the accident and passed them at a speed which one estimated at around 60 or 70 miles per hour. Defendant's car, as the first witness described it,

> come up behind me at a high rate of speed and pull right up on my back bumper and then he swerved out and passed me at a pretty high rate of speed and then he continued on the side of the road and on for a ways and then he swerved back over the white line three or four times . . . .

A passenger and younger brother of the driver testified that his brother was driving 45 miles per hour when the defendant's car went past them at a high rate of speed, and "he started weaving all over the road, over the white line." Both witnesses said it was a bad night for driving, with heavy rain, high winds and low visibility.

Another witness, Edward B. Hettel, living near the scene of the accident, heard the sound of the crash shortly after 6 p.m., and ran from his home to the highway. He first looked in the Brooks car, he said, and then the May car, and then returned to Brooks and helped him from the car. He said that, as he opened the car door, he saw "There was bottles all over the back seat," and there was a heavy odor of alcohol. He described helping defendant from his wrecked automobile:

> A. Yes, when we took him out I was holding him up. He could hardly stand. Q. What did he say? A. He says, "Was I involved in an accident?" I said, "Yes, you was." He says, "Where's my wife?" I says, "I don't know." "Well," he says, "can I have another drink?" And I says,

"The best thing you can do is just shut up and lay down."

Evidence as to the location of the cars and their appearance after the accident, together with descriptions of the massive quantities of debris from them in the southbound lane, enabled the jury to infer that the defendant at the time of the crash had driven his car into the wrong or southbound lane as he rounded the curve. Pictures of the vehicles taken after the accident showing the heavy damage done by the impact allowed the jury to conclude that one of the cars had been traveling at a very high rate of speed just before they hit.

Altogether, there was substantial evidence to support an issue of driving while under the influence of intoxicating liquor. Actually, the record shows a substantially greater quantum of evidence as to intoxication than was held sufficient to support that very issue in *State v. Uglem*, 68 Wn.2d 428, 413 P.2d 643 (1966). In that case, the defendant driver was knocked unconscious by the impact and remained in a coma for 5 days. Although, as in *Uglem*, all of the evidence as to the actual consumption of beer came from sources which the jury could regard as friendly to the defendant, there was, in the present case, additional evidence of erratic driving and high speed which the jury could have associated with the consumption of alcohol. And, unlike *Uglem*, we have here the defendant's remarks at the accident that he wanted another drink. The defendant's actions during the drive and at the scene of the accident go beyond the requirements of *Uglem*, and along with other evidence of his drinking permitted the charge of being under the influence of or affected by intoxicating liquor to be submitted to the jury. *State v. Bowman*, 57 Wn.2d 266, 356 P.2d 999 (1960).

That the jury, in weighing this evidence and making inferences therefrom, found for the defendant on this issue is immaterial. The test as to whether the court properly submitted the issue to the jury—and the court not the jury makes it—is whether the record discloses substantial evi-

dence to prove the issue, and not how the jury ultimately resolved the issue from the evidence.

Defendant assigns error to the court's refusal to give his proposed instruction No. 9 which required a finding of reckless driving and also declared that ordinary negligence is insufficient to support a verdict.[2] Ordinary negligence, it is true, will not support a conviction of negligent homicide by means of a motor vehicle. On the subject of ordinary negligence, however, the court did instruct the jury in instruction No. 5 that "The term 'to operate a motor vehicle with disregard for the safety of others' is defined to mean more than inadvertence or momentary inattention to driving or mere absence of ordinary care." Perhaps as defendant suggests, this instruction falls short of perfection and could have been improved upon, but we note that it does set forth a proper statement of the law, and, in the absence of a better one offered by defendant, adequately covered the subject.

█ Although the court properly could have added to this instruction the declarative sentence that ordinary negligence as defined would be insufficient to support a conviction, defendant requested no such instruction, and the court, in defining the offense and describing its components, was not obliged to traverse the things which would not constitute negligent homicide. Courts are not required to give negative instructions (*State v. Harvey*, 57 Wn.2d 295, 356 P.2d 726 (1960)), although, in the interests of clarity, they may properly do so in some circumstances.

As to the instruction requested by defendant (proposed instruction No. 9),[2] it was clearly erroneous for the instruction controverts what the statute affirmatively declares. Although it correctly states that a finding of ordinary negligence will not support a conviction of negligent homicide, it incorrectly asserts that the negligence must amount to

[2]"The Court further instructs you that negligence in operating a motor vehicle does not render a person guilty of negligent homicide unless the negligence amounts to reckless driving. A finding of ordinary negligence will not support a conviction of negligent homicide." Defendant's proposed instruction No. 9.

reckless driving and thus erroneously would preclude a conviction under the third statutory method of committing the offense, *i.e.*, that of driving with disregard for the safety of others.

Finally, we consider whether the evidence was sufficient to sustain a conviction of driving with disregard for the safety of others. On this point, the facts strikingly resemble those in *State v. Eike*, 72 Wn.2d 760, 435 P.2d 680 (1967), where we recently upheld the idea that, although ordinary negligence alone would be insufficient to sustain a conviction of negligent homicide, if additional elements of bad driving were proved so as to enable the jury to reasonably find that the defendant's negligence amounted to a disregard for the safety of others, the requirements of the statute would be deemed fulfilled. Here, as in *Eike*, there was evidence that the defendant was driving at a high rate of speed—the distinction being that the speed in *Eike* was high but within the maximum legal speed limit, whereas here there was evidence of speed beyond the legal limit. In *Eike*, it was dark and raining lightly; here it was raining very heavily and visibility was bad. In both cases, the debris from the collision permitted a strong inference that the collision occurred in the oncoming lane. In other words, in each case there was proof that the accused, just before and at impact, was driving at a high rate of speed on the wrong side of the highway. This evidence supports a conviction of driving with disregard for the safety of others.

Affirmed.

Finley, C. J., Weaver, Rosellini, and McGovern, JJ., concur.